UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| JOSH ZANDI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:10-CV-395-JVB |
| | ) | |
| FORT WAYNE COMMUNITY SCHOOLS, | ) | |
| | ) | |
| Defendant. | ) | |

**OPININON AND ORDER**

Plaintiff Josh Zandi was a student at Northrop High School in Fort Wayne, Indiana. During his junior year, Josh began suffering allergic reactions to the scent of certain perfumes, fragrances, and lotions. The reactions differed in the level of severity---some manifested in rashes and swelling in the face whereas others required hospitalization---but in March of his senior year, Josh had to switch to home-based education to avoid serious illness.

Believing that the school was not doing everything it could to prevent his anaphylactic shock, Josh sued the Fort Wayne Community Schools five months earlier. The lawsuit sought both injunctive and monetary relief. Josh graduated in June 2011 and his request for injunctive relieve is now moot. As for the remainder of the lawsuit, the parties filed cross-motions for summary judgment. For the reasons explained below, the Court grants Defendant's motion and denies Josh's motion.

**A.      Summary Judgment Standard**

By the terms of Federal Rule of Civil Procedure 56 summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996). Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003). Rather, the process of evaluating the facts in the light most favorable to the nonmovant, first for one side and then for the other, may reveal that neither side has enough evidence to prevail without a trial. *Id*. at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Ins.*, 246 F.3d 975, 983 (7th Cir. 2001) (quoting *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)). Mindful of these standards, the court now turns to the factual basis for the parties' motions and then to their substance.

**B.      Motions to Strike**

Defendant filed two motions to strike. Both motions seek to strike the affidavit of Michael Harmeyer, and one of the motions seeks also to strike various portions of the affidavits of Josh Zandi and Janice Zandi on the grounds that they contradict the testimony that Josh and Ms. Zandi gave during their depositions. Rather than addressing each of the multiple issues raised separately, the Court will rely on the parties' briefs in setting forth the relevant and admissible material facts in this opinion.

Also related to the Defendant's motions to strike is its objection to Josh's motion to file a supplemental affidavit by Mr. Harmeyer. The Court will allow the affidavit even as it recognizes its limited value for Josh's case.

**C.     Material Facts**

Josh Zandi was a student at Northrop High School in Fort Wayne, Indiana. Beginning in the eleventh grade, Josh began having allergic reactions to body sprays, perfumes, colognes, laundry detergents, fabric softeners, and scented lotions. He does not react to all perfumes or colognes and he does not know which ones in particular cause the allergic reactions. He also does not know how much of a given fragrance will trigger a reaction. Likewise, he cannot predict the severity of the reaction, if he experiences one. When Josh experiences a reaction, symptoms typically include swelling of the face and throat, tightness in the chest, and difficulty breathing. These symptoms vary greatly in intensity.

**(1)     *Allergic Reactions During Josh's Junior Year***

During Josh's junior year, he spent the mornings at Anthis Career Center and the afternoon at Northrop High School. In November of that year, Josh had his first allergic reaction at school. The reaction began after he smelled a strong fragrance in the hallway between classes. There were a lot of students around; Josh never saw anyone spray perfume. Within 20 minutes, Josh began to experience a reaction. He was given an EpiPen injection and the school called an ambulance as is required by its protocol. After being seen in the emergency room, Josh was released the same day.

Josh had other minor reactions during his junior year, but he does not remember details about any of them. He does not remember whether he smelled a fragrance before these incidents. Typically, he would get rashes on his arms and chest. Josh never saw anyone spraying anything before these reactions occurred.

At some point, Josh's mother, Ms. Zandi, called the school's nurse, Darlene Yarnelle, to inquire whether a policy could be issued to stop the spraying of perfume at school. Ms. Yarnelle told Ms. Zandi that she did not think that was possible, but she would notify the teachers about the issue.[1]

Ms. Yarnelle did this on December 17, 2009. She sent an email to Josh's teachers informing them of the reactions he had experienced. She urged the teachers to speak with their classes about the dangers of spraying fragrances, to tell the students not to spray, and to talk to their friends about the issue.

Later the same day, administrator Cheryl Strader sent an email to the entire Northrop staff about the dangers of spraying perfumes, alluding to Josh's situation in particular. This email asked the school-wide staff to tell students to spray only in the restrooms, if they must spray at all.

A few weeks later, Barb Ahlersmeyer, the principal at Northrop, followed up with an email to all staff reiterating that students should not be spraying fragrances in classrooms or hallways. She also arranged to advise the student body periodically, during morning announcements, that scents should not be sprayed outside of the restrooms.

In addition, an article was run in the student newspaper about Josh's situation in order to raise awareness of the issue. In the article, Nurse Yarnelle reiterated that students should refrain from excessive use of fragrances, and should avoid spraying in the hallways or commons.

---

[1] Ms. Zandi did not pursue this matter further until the beginning of Josh's senior year.

Finally, Ms. Yarnelle also offered to put up posters around the school to further publicize the issue, if the Zandis wished to do so.

**(2)**   *Allergic Reactions During Josh's Senior Year*

At the beginning of his senior year, on September 14, 2010, Josh experienced another reaction at school.  Following this incident, Ms. Zandi arranged a meeting with the school principal, Barbara Ahlersmeyer, on September 17, 2010.  Ms. Zandi's wanted to give Ms. Ahlersmeyer some materials printed off the internet related to anaphylactic shock, and to again request that the school issue a formal written policy barring the spraying of perfume inside the school.  Ms. Ahlersmeyer declined to take the materials. Mr. Ahlersmeyer later attested that she did not take the materials because she already knew about anaphylactic shock reactions. Ms. Ahlersmeyer told Ms. Zandi that it was too late in the year to issue a written policy regarding the spraying of fragrances, and that formal policies needed to originate from the school district's central office in any event. Also, Ms. Ahlersmeyer considered the policy proposed by Ms. Zandi to be inadvisable, because it would have been difficult to police. Ms. Ahlersmeyer did offer to continue to run periodic morning announcements instructing students not to spray perfumes in school. In Ms. Ahlersmeyer's experience, which includes 15 years as a principal and 20 more years as an administrator, periodic verbal announcements were actually more effective than written policies.

Ms. Zandi made no other request for accommodation. Ms. Zandi claims that at one point during the conversation, Ms. Ahlersmeyer commented that "Josh just has bad genes," which offended her. The conversation concluded with Ms. Ahlesrsmeyer telling Ms. Zandi that there was just nothing more the school could do to protect Josh from harm.

Ms. Zandi then called Superintendent Wendy Robinson but had to leave a message with her assistant. She did not get an immediate response, and she next called the school board president, Mark GiaQuinta. She left a detailed phone message but no one called her back.

Josh continued to have several minor allergic reactions at school. He remembers little about them, but at least one of them occurred while he was in the commons area, where students mill about between classes and at lunch. Josh remembers smelling a fragrance before most, but not all, of his reactions. When he did smell a fragrance, sometimes it was strong and sometimes it was just a hint of fragrance. As with his reactions during the junior year, he does not remember seeing anyone spraying anything before the onset of the allergic reaction.

The next significant allergic reaction took place on October 25, 2010. Josh was hospitalized for five days. After this incident, Ms. Zandi asked Josh's treating allergist, Dr. Mohan Menon, to write principal Ahlersmeyer asking her to implement a no spray policy at the school. Dr. Menon sent such a letter on November 9, 2010.

Frustrated with the school's refusal to implement a written policy prohibiting the spraying of perfumes at school, Ms. Zandi retained legal counsel and, on November 12, 2010, sued the school to effect the change.

Starting in November, every time that Josh reported a reaction, Ms. Ahlersmeyer reviewed the tape from the school video cameras to see if she could determine whether anyone had sprayed perfume before the onset of Josh's allergic reaction.  Ms. Ahlersmeyer never found any evidence on the tapes, however, nor did she otherwise learn of students spraying.

Starting in November or December 2010, Northrop came up with several additional ideas for reducing the risk of further incidents:

6

- allowing Josh to park in a different area and enter the school through a different door than the rest of the students, in order to avoid the rush of students in the commons area;

- providing Josh a pass to leave class a few minutes early, again in order to avoid the rush;

- allowing Josh to arrive at a different time, if he so wished; and

- exploring with Josh whether he could wear a protective mask.

Josh accepted the first two ideas.

On December 6, 2010, Plaintiffs' then-attorney, Michael Harmeyer, met with Ms. Ahlersmeyer, along with Fort Wayne Community Schools' in-house counsel William Sweet, and outside counsel Matthew Elliott. Mr. Harmeyer submitted an affidavit about the discussions at this conference which purports to establish the school's disinterest in taking action. He gives the examples of the following comments by school officials or their lawyers: "it would be unlawful to restrict the spraying scents since we can't discipline the act," "we can't regulate student behavior unless it has a direct adverse consequence upon the overall learning environment for the school at large," "you can't enforce what you can't see," "something's not right," and "there's nothing else we can do until we know what the agent is." (Aff. Michael Harmeyer ¶ 4.)

On January 3, 2011, Mr. Harmeyer sent a letter to Mr. Elliott "to respond to the various questions and concerns" raised by the school at the meeting. Among other things, he noted in the letter that there was some discussion about home-based education for Josh:

> Home-based instruction facilitated by visiting tutor(s). This could be an effective approach toward reduction of the risk, but it would deprive Josh of the socialization part of the high school experience. In any event, you mentioned that [Fort Wayne Community Schools] is flat-out rejecting this alternative, without further consideration, based upon cost considerations.

(DE 40-3, Harmeyer's Letter at 4.)

7

During the second semester, Josh's schedule changed and he attended Northrop all day. He requested and was allowed to eat lunch in the office area to avoid the lunch rush. Meanwhile, throughout the year, periodic announcements discouraging the spraying of fragrances continued, and Josh's teachers were instructed to be on the lookout for spraying or scents in their classrooms.

On March 7, 2011, Ms. Ahlersmeyer and the guidance counselor met with Josh and his mother to discuss a schedule change that Josh was considering. Josh was exploring whether he could drop some classes so that he wouldn't have to spend all day in the building, but it turned out that those classes were necessary for an academic diploma, which he wanted. As a result, Josh decided not to drop them. As was noted during the meeting, however, if Josh finished his trigonometry course early, it might be possible to amend his schedule at that point.

Also at the March 7 meeting, Ms. Ahlersmeyer suggested that Josh and his mother consider the option of a homebound education program, which, if approved downtown, would allow Josh to finish out all his classes at home, away from any potential sources of reaction at school. Josh and his mother decided against homebound education at this point, however, because he wanted to finish out his senior year at Northrop. Nonetheless, Josh's mother was advised to fill out the homebound education paperwork in case it should be needed for the future. She did not do so, however, because she was holding out homebound education as "the last resort." (Janice Zandi Dep. at 74--75).

Nine days later, Josh had his most severe reaction to date. Josh does not remember what triggered this reaction, but he was taken to the ICU as a result. Thereafter, Ms. Ahlersmeyer came to the hospital and urged Josh to consider the homebound education program for the

remainder or the year. Josh did so, his application was approved, and from then on, he took his classes at home.

Josh graduated from Northrop in June 2011 with high honors and a 3.7 GPA.

When asked at their depositions if they believed that Ms. Ahlersmeyer or anybody else intentionally discriminated against Josh, both he and Ms. Zandi answered in the negative. (Josh Dep. at 99 ("Absolutely not"); Ms. Zandi Dep. at 43 ("No").)

Also, during the deposition Josh conceded that he has no evidence that anything that Northrop did or did not do caused his allergic reactions. (Josh Dep. at 99.) Although Ms. Zandi believes that having a written policy "would have solved the problem," she also acknowledges that she has no evidence to support this belief, and that Northrop cannot control the actions of the 2300 people at Northrop. (Ms. Zandi Dep. at 39—40.)

**D.     Discussion**

Josh argues that Northrop discriminated against him because of his disability---severe allergy to certain fragrances---by failing to implement a written policy against spraying perfumes at school and thus violated Title II of the ADA, 42 U.S.C. §§ 12132, et seq., and the Rehabilitation Act, 29 U.S.C. §§ 701, et seq. Defendant concedes that Josh has some form of disability that is covered by the ADA and the Rehabilitation Act but argues that Zandis' request for such a policy was unreasonable. Defendant submits that Plaintiff has not presented evidence that the policy would have prevented the allergic reactions Josh suffered. Moreover, Defendant insists that it had provided Josh with reasonable accommodate even in the absence of the written policy.

9

Title II of the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Discrimination under both Title II of the ADA and the Rehabilitation Act "may be established by evidence that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999). Here, Josh seeks to establish that Defendant refused to provide a reasonable modification, or accommodation, to school's written policies.

**(1)**     *Exhaustion of Claims*

Defendant argues that Josh's claim should be dismissed outright because he has not exhausted administrative remedies under the Individual with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., before bringing a suit under the ADA and the Rehabilitation Act. Josh responds that the IDEA does not apply as he was not "a child with a disability, " 20 U.S.C. § 1401(3)(A), as he needed no special services and did not have any impairments that hindered his learning.

Defendant's argument fails. First, there is no evidence that Northrop treated Josh as a student covered by the IDEA. Furthermore, his parents were not seeking special education, only an accommodation for his severe allergy to fragrances. In fact, Defendant has not identified any learning disability in Josh. But most importantly, there is nothing in the record to suggest that the Zandis knew of their right to ask for review of the school's decision under the IDEA or that Defendant gave them notice of such a right. Lack of such notice, when parents otherwise do not

10

know of their rights, dooms the school's defense on the grounds of the exhaustion requirement. *Cf. Sandlin v. Switzerland County Sch. Corp.*, 2009 WL 2563470 (S.D. Ind. Aug. 17, 2009) ("But school officials who seek to rely on the procedures of the [Individuals with Disability Education Improvement Act] have an obligation to inform a child's parents of their rights under that law if they want to use those procedures as a defense.").

**(2)**     ***Reasonableness of Accommodation***

Josh concedes that several weeks after he filed this lawsuit on November 12, 2010, he began receiving reasonable accommodations for his disability:

> Although the school representatives continued their hard-line positions on December 16, 2010, plaintiff subsequently discovered that school officials were, behind scenes, implementing a number of reasonable and productive accommodations, during the months of December 2010 and January 2011, extending to the eventual offer of home-based education as extended in March 2011.

(Pl.'s Br., DE 44 at 9.)

He argues, however, that these accommodations were the result of the lawsuit and he should, therefore, be deemed the prevailing party as a matter of law:

> [T]he Court should determine as a matter of law that the accommodations would not have been made had the Zandis not contacted counsel and had suit not been filed. In other words, Josh Zandi has prevailed because the lawsuit caused [Fort Wayne Community Schools] to implement a variety of reasonable and appropriate accommodations regardless of whether [Fort Wayne Community Schools] failed to establish a school-wide "written policy.

(*Id.* at 17). Josh also maintains that Northrop's failure to implement reasonable accommodations sooner violated Title II of the ADA and the Rehabilitation Act. Finally, Josh insists that he is entitled to money damages because he has presented evidence of intentional discrimination against him.

11

Josh's first contention---that he is the prevailing party because Northrop began implementing a variety of reasonable accommodations shortly after his lawsuit was filed---is without merit. There are two reasons for that. First, as the Court will explain shortly, Northrop had been providing Josh with reasonable accommodations even before the lawsuit was filed. But most importantly, the timing of and motivation for the post-suit accommodations are irrelevant, in determining the prevailing party. This issue was settled over a decade ago in *Buckhannon Bd. and Care Home, Inc. v. W. Virginia Dept. of Health and Human Servs.*, 532 U.S. 598 (2001) ("[W]e hold that the 'catalyst theory' is not a permissible basis for the award of attorney's fees."). Therefore, even if Northrop chose to provide additional accommodations to Josh solely because of the lawsuit, he would not be entitled to the status of the prevailing party and the attorney's fees that follow in civil rights actions such as this one. "[A] party cannot be deemed to have prevailed, for purposes of fee-shifting statutes . . . unless there has been an enforceable 'alteration of the legal relationship of the parties.' That is the normal meaning of 'prevailing party' in litigation, and there is no proper basis for departing from that normal meaning." *Id.* at 622. Josh's arguments to the contrary are unavailing.

Josh next argues that Defendant violated the law because it failed to provide him with reasonable accommodation before the lawsuit was filed. Josh appears to believe that he could have been reasonably accommodated only by the school instituting a written policy against spraying fragrance.

Josh's argument fails on this point as well. After Ms. Zandi met with the school nurse during his junior year, the school began taking measures to inform the students and staff about Josh's situation. Throughout his junior year (2009—2010 school year), Northrop's staff was advised of Josh's condition and told to be on the lookout for the spraying of perfume. In

12

addition, students were advised in regular announcements not to spray, and the school newspaper ran an article to raise awareness of Josh's condition. The school nurse even offered to put up posters if Josh wished. The principal continued the periodic announcements into the following school year. These accommodations were reasonable in light of the mild or moderate intensity of his allergic reactions before September 14, 2010.[2]

In light of what the school was already doing to accommodate Josh, Ms. Ahlersmeyers refusal to enact a written no spray policy was reasonable. Under Indiana Code § 20-33-8-12, disciplinary policies are to be issued district-wide, with advance notice to students.  Fort Wayne Community Schools fulfills this obligation by issuing its Student Rights and Responsibilities Code at the beginning of the school year, and Ms. Zandi's request to Ms. Ahlersmeyers came once the school was already in session for some time.

Second, and just as important, Josh has not provided evidence showing that the written policy, as opposed to what the school was already doing, would have prevented his allergic reactions. Although Josh suffered multiple reactions of varying degrees of severity, there is no evidence that anyone sprayed perfume inside the school. In fact, in some cases Josh did not even smell perfume before a reaction. Without a medical or other expert opinion establishing that perfume sprayed in the building elicited a different reaction than perfume already sprayed on a person who enters the building, Josh cannot show that even an effective written policy would have prevented his reactions from occurring.

As for the requirement that Josh present evidence that any discrimination was intentional, his brief contains only conclusory statements. (*See* Pl.'s Br., DE 44 at 19.) He altogether ignores

---

[2] The parties spend considerable energy arguing about who and when first came up with the idea of home-based education for Josh. The school claims that it was Ms. Ahlersmeyers at the March 2011 meeting; the Zandis claim that this was first proposed to the school in December 2010 by their attorney, Mr. Harmeyer. Be as it may, the timing and the origins of the idea are irrelevant as Josh concedes that at least after November 12, the date this suit was filed, the school  began providing him with reasonable accommodations.

13

his and his mother's responses during the deposition where they both expressed certainty that neither Ms. Ahlersmeyer nor anyone else at the school was intentionally discriminating against him. (Josh Dep. at 99 ("Absolutely not"); Ms. Zandi Dep. at 43 ("No").)

**E.** **Conclusion**

For these reasons, the Court grants Defendant's motion for summary judgment (DE 27) and denies Plaintiff's motion for summary judgment (DE 43). The Clerk is ordered to enter judgment in favor of Defendant and against Plaintiff.

SO ORDERED on September 27, 2012.

         S/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE